Brett JACKSON and Linda
Estrada, Petitioners,

v.

John POWER, M.D.; Fairbanks Memorial Hospital; Lutheran Hospital and Homes Society of America, Inc.; Emergency Room, Inc.; William H. Montano, M.D.; and George Vrablick, M.D., Respondents.

No. S–1677.

Supreme Court of Alaska.

Oct. 16, 1987.

Michael Cohn, Dan A. Hensley, L. Ames Luce, Law Offices of L. Ames Luce, Anchorage, for petitioners.

James J. Delaney, Howard A. Lazar, Delaney, Wiles, Hayes, Reitman & Brubaker, Anchorage, for respondents Fairbanks Memorial Hosp. and Lutheran Hosp. & Homes Soc.

Peter J. Maassen, Burr, Pease & Kurtz, Anchorage, for respondents John Power, M.D. and Emergency Room, Inc.

David C. Crosby, Council & Crosby, Juneau, for Health Ass'n of Alaska, amicus curiae.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS and COMPTON, JJ.

OPINION

BURKE, Justice.

This case presents an issue of first impression in this state, concerning health care delivery in hospital emergency rooms. The question that we must resolve is whether a hospital may be held vicariously liable for negligent health care rendered by an emergency room physician who is not an employee of the hospital, but is, instead, an independent contractor. We hold that the hospital in this case had a non-delegable duty to provide non-negligent physician care in its emergency room and, therefore, may be liable.

I

On the evening of May 22, 1981, sixteen year old Brett Jackson was seriously injured when he fell from a cliff. Jackson was airlifted to Fairbanks Memorial Hospital (FMH). Shortly after midnight, he was received in the hospital's emergency room.

Jackson was examined by respondent John Power, M.D., one of two emergency room physicians on duty at the time. Dr. Power's examination revealed multiple lacerations and abrasions of the patient's face and scalp, multiple contusions and lacerations of the lumbar area, several broken vertebrae and gastric distension, suggesting possible internal injuries. Dr. Power ordered several tests, but did not order certain procedures that could have been used to ascertain whether there had been damage to the patient's kidneys. Jackson had, in fact, suffered damage to the renal arteries and veins which supply blood to and remove blood from the kidneys. This damage, undetected for approximately 9 to 10 hours after Jackson's arrival at FMH, ultimately caused Jackson to lose both of his kidneys.

II

Jackson and his mother, Linda Estrada, (hereinafter referred to collectively as Jack-

son) filed suit. In their complaint they alleged negligence in the diagnosis, care and treatment Jackson received at FMH. Jackson moved for partial summary judgment seeking to hold FMH vicariously liable as a matter of law for the care rendered by Dr. Power. In support of his motion, Jackson advanced three separate theories: (1) enterprise liability; (2) apparent authority; and (3) non-delegable duty.

After briefing and argument, the superior court held, as a matter of law, that FMH could not be held liable under an enterprise liability theory, and that genuine issues of material fact precluded summary judgment on the two remaining theories.[1] We subsequently granted Jackson's petition for review of the court's ruling.

### III

█ Initially, it is important to clarify the exact issue that we have been asked to resolve. Jackson has conceded, for purposes of this appeal, that Dr. Power was not an employee of FMH, but an independent contractor employed by respondent Emergency Room, Inc. (ERI), and that ERI and FMH are separate legal entities. Traditional rules of *respondeat superior* are, therefore, inapposite. Jackson also makes no claim that FMH was itself negligent in its selection, retention, or supervision of Dr. Power. Consequently, we have no occasion to consider the doctrine of corporate

negligence.[2] Jackson asks us to resolve only whether a hospital should be vicariously liable, as a matter of public policy, for the negligence or malpractice[3] of an independent contractor/physician, committed while treating a patient in the hospital's emergency room, under theories of (1) enterprise liability; (2) apparent authority; or (3) non-delegable duty.

### IV

As previously noted, this case presents this court with an issue of first impression.[4]

█ The generally accepted rule is that, where an employment relationship exists between the physician and the hospital, the hospital will be liable, under the traditional rule of *respondeat superior*, for any negligence or malpractice which results in injury to a hospital patient. *E.g., Bing v. Thunig*, 2 N.Y.2d 656, 163 N.Y.S.2d 3, 11, 143 N.E.2d 3, 9 (N.Y.1957); *Weldon v. Seminole Municipal Hospital*, 709 P.2d 1058, 1059 (Okla.1985). Conversely, no liability attaches to the hospital when the physician is an independent contractor. *E.g. Greene v. Rogers*, 147 Ill.App.3d 1009, 101 Ill.Dec. 543, 547, 498 N.E.2d 867, 871 (1986); *Hill v. St. Clare's Hosp.*, 67 N.Y.2d 72, 499 N.Y.S.2d 904, 908, 490 N.E.2d 823, 827 (1986). *See generally* Comment, *The Hospital–Physician Relationship: Hospital Responsibility for Malpractice of Phy-*

1. The superior court also rejected three motions for summary judgment by various respondents seeking to have Linda Estrada's claim against them dismissed on the ground that it was time barred by the statute of limitations. None of the respondents cross-petitioned for review of that issue.

2. The doctrine of corporate negligence holds that a hospital owes an independent duty to its patients to use reasonable care to insure that physicians granted hospital privileges are competent, and to supervise the medical treatment provided by members of its medical staff. *See Tucson Medical Center v. Misevch*, 113 Ariz. 34, 545 P.2d 958, 960 (1976); *Darling v. Charleston Community Mem. Hosp.*, 33 Ill.2d 326, 211 N.E.2d 253 (1965); *Pedroza v. Bryant*, 101 Wash.2d 226, 677 P.2d 166, 170 (1984); *Johnson v. Misericordia Community Hosp.*, 99 Wis.2d 708, 301 N.W.2d 156 (1981). *See generally*, Janulis & Hornstein, *Damned If You Do, Damned If*

*You Don't: Hospitals' Liability for Physicians' Malpractice*, 64 Neb.L.Rev. 689, 702–08 (1985); Note, *Hospital Corporate Liability: An Effective Solution to Controlling Private Physician Incompetence*, 32 Rutgers L.J. 342, 360–72 (1979).

3. Jackson has yet to prove that any negligence or malpractice did in fact occur. In order to resolve the issue presented here, however, we must assume negligence. We, of course, express no opinion as to the actual merits of Jackson's claim.

4. In *Baker v. Werner*, 654 P.2d 263, 267 n. 6 (Alaska 1982), Baker appealed the trial court's rejection of his theory of vicarious liability in a wrongful death action against a physician, hospital and attending nurse. Because we upheld the jury's finding that the defendants were not negligent, we did not reach the merits of the issue, "any theory of vicarious liability [being] irrelevant." *Id.*

*sicians,* 50 Wash.L.Rev. 385 (1975) (hereinafter "Comment, *Hospital Responsibility* ").

Jackson concedes that Dr. Power was an independent contractor; however, he asserts that Alaska's law of *respondeat superior* mandates a result different than that which would be reached under the general rule.[5] Jackson argues that our decision in *Fruit v. Schreiner,* 502 P.2d 133 (Alaska 1972), establishes that the law of "vicarious legal responsibility" in Alaska is "enterprise liability." Thus, he contends, if the enterprise impacts society and the negligent act occurred during an activity performed for the benefit or in the interest of the enterprise, the enterprise is liable.

■ Jackson's argument proves unpersuasive. First, Jackson's interpretation of *Fruit* is flawed. A close reading of that case shows that we did not view "enterprise liability" as a separate theory of liability or a distinct cause of action. Rather, enterprise liability was seen as one of two widely accepted theories used by courts to justify imposition of vicarious liability in an established employer/employee context. *Id.* at 138–39. As was noted in *Fruit:*

[T]he "enterprise" theory ... finds liability whenever the enterprise of the employer would have benefited by the context of the act of the *employee* but for the unfortunate injury.

....

The rule of *respondeat superior* however, ... is *limited* to requiring an enterprise to bear the loss incurred as a result of the *employee's* negligence. The acts of the *employee* need be so connected to his employment as to justify requiring that the employer bear that loss.

*Id.* at 140–41 (emphasis added) (footnotes omitted). *See generally* Morris, *Enterprise Liability and the Actuarial Process—the Insignificance of Foresight,* 70 Yale L.J. 554 (1961).

Additionally, our decisions since *Fruit* show that we have applied the theory of *respondeat superior* only in an employer/employee context, unless one of the well established exceptions to that rule exists. *See, Parker Drilling v. O'Neill,* 674 P.2d 770, 775 (Alaska 1983); *Williams v. Alyeska Pipeline Service Co.,* 650 P.2d 343, 349 (Alaska 1982); *Hammond v. Bechtel Inc.,* 606 P.2d 1269, 1273 (Alaska 1980); *Barton v. Lund,* 563 P.2d 875, 876 (Alaska 1977); *Luth v. Rogers & Babler Construction,* 507 P.2d 761, 763–64 (Alaska 1973). Jackson's theory presents no such exception.

Finally, the cases from other jurisdictions cited by Jackson provide little support for his theory; those cases deal only with theories of apparent agency or corporate negligence. Moreover, although at least two courts appear to have implicitly indicated a willingness to recognize a theory of enterprise liability, *see Alden v. Providence Hospital,* 382 F.2d 163, 166 (D.C. Cir.1967); *Adamski v. Tacoma General Hospital,* 20 Wash.App. 98, 579 P.2d 970, 977 & n. 5 (1978), to date, no court has explicitly embraced that concept.[6]

In short, Jackson's theory of enterprise liability is not yet the law in Alaska.

## V

Jackson next argues that the trial court erred in holding that genuine issues of material fact prevented it from granting summary judgment on his theory of apparent authority.

---

5. The trial court decided the issue of the applicability of enterprise liability as a matter of law. We scrutinize questions of law under a *de novo* or independent judgment standard of review. *Hicklin v. Orbeck,* 565 P.2d 159, 163 n. 6 (Alaska 1977), *rev'd on other grounds,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978). When reviewing a question of law, it is our "duty to adopt the rule of law that is most persuasive in light of precedent, reason and policy." *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

6. Some commentators have suggested an enterprise tort doctrine as a basis for imposing liability for any tort occurring as part of the hospital enterprise. *See* Southwick, *Hospital Liability: Two Theories Have Been Merged,* 4 J. Legal Med. 1, 3–5 (1983); Comment, *Hospital Responsibility, supra* at 418–19.

Although we have recognized the doctrine of apparent authority in other contexts, *see City of Delta Junction v. Mack Trucks,* 670 P.2d 1128, 1129–30 (Alaska 1983) (national distributor and local franchise); *Perkins v. Willacy,* 431 P.2d 141, 142 (Alaska 1967) (husband and wife), this is the first time we have been asked to apply this doctrine to a hospital-independent contractor/physician relationship.

Cases from other jurisdictions show a strong trend toward liability against hospitals that permit or encourage patients to believe that independent contractor/physicians are, in fact, authorized agents of the hospitals.[7] These courts have held hospitals vicariously liable under a doctrine labeled either "ostensible" or "apparent" agency or "agency by estoppel." *See Porubiansky v. Emory University,* 156 Ga. App. 602, 275 S.E.2d 163, 168 (1981); *Paintsville Hospital v. Rose,* 683 S.W.2d 255, 257 (Ky.1985); *Mehlman v. Powell,* 378 A.2d 1121 (Md.1977); *Grewe v. Mt. Clemens General Hospital,* 404 Mich. 240, 273 N.W.2d 429, 432–33 (1978); *Arthur v. St. Peters Hospital,* 169 N.J.Super. 575, 405 A.2d 443 (1979); *Hannola v. City of Lakewood,* 68 Ohio App.2d 61, 426 N.E.2d 1187, 1192 (1980); *Weldon,* 709 P.2d at 1060; *Themins v. Emanuel Lutheran Charity Bd.,* 54 Or.App. 901, 637 P.2d 155, 158–59 (1982); *Adamski v. Tacoma General Hospital,* 20 Wash.App. 98, 579 P.2d 970, 977 (1978); *see generally* Janulis & Hornstein, *supra* at 696–702. Although courts and commentators often use these terms interchangeably, they are not theoretically identical.

■ The "ostensible" or "apparent" agency theory is based on Section 429 of the Restatement (Second) of Torts (1965), which provides:

One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

Two factors are relevant to a finding of ostensible agency: (1) whether the patient looks to the institution, rather than the individual physician, for care; and (2) whether the hospital "holds out" the physician as its employee. *Simmons v. St. Clair Memorial Hospital,* 332 Pa.Super. 444, 481 A.2d 870, 874 (1984); *see also Irving v. Doctors Hospital of Lake Worth,* 415 So.2d 55, 60–61 (Fla.App.1982); *Smith v. St. Francis Hospital,* 676 P.2d 279, 282 (Okla.App.1984).

■ "Agency by estoppel," in contrast, is predicated on the arguably stricter standard of the Restatement (Second) of Agency § 267 (1958). Section 267 provides:

One who represents that another is his servant or agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

Under this theory, there must be actual reliance upon the representations of the principal by the person injured. *Mehlman,* 378 A.2d at 1123.

Thus, theoretically, there need be no causal relationship between the principal's conduct and the plaintiff's reliance to warrant a conclusion of ostensible agency; such a causal relationship and such a change of position, however, is the essence of estoppel to deny agency. Janulis & Hornstein, *supra* at 697.

■ Jackson, in essence, asks us to adopt a rule of ostensible agency. FMH,

---

7. The only exception to this modern trend of which we are aware is *Greene v. Rogers,* 147 Ill.App.3d 1009, 101 Ill.Dec. 543, 498 N.E.2d 867 (1986). In *Greene,* the court specifically refused to apply apparent agency to a hospital-emergency room doctor relationship because "[t]he absence of the power to control the decision-mak-

ing of the emergency room physician demands that the independent relationship between hospital and emergency room physician be recognized." *Id.* 101 Ill.Dec. at 547, 498 N.E.2d at 871. We view *Greene* as an aberration dependent upon reasoning which is not particularly persuasive.

on the other hand, requests that we follow *Greene* and refuse to apply this doctrine in the hospital-physician context or, alternatively, that we adopt a rule which is essentially estoppel by agency. Although we find nothing antithetical about applying the doctrine of apparent authority to a hospital-independent contractor/physician relationship, we perceive no reason to adopt a special rule in this area. We believe that traditional rules of apparent authority provide sufficient guidelines.

In *City of Delta Junction*, we defined the doctrine of apparent authority in Alaska as follows:

Apparent authority to do an act is created as to third persons by written or spoken word or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.

670 P.2d at 1130 (quoting Restatement (Second) of Agency § 27, at 103 (1958)). We went on to emphasize that it is the *principal's* conduct that gives rise to his liability and not the conduct of the alleged agent; "one dealing with an alleged agent must prove that the principal was responsible for the appearance of authority, by doing something or permitting the alleged agent to do something that led others, including the plaintiff, to believe that the agent had the authority he purported to have." *Id.* (quoting W. Seavy, *Handbook of The Law of Agency* § 8, at 13 (1964)).

Relying on *City of Delta Junction*, the trial court held that existing factual disputes required Jackson to submit his apparent authority theory to the jury. When reviewing the denial of a motion for summary judgment, we must determine whether genuine issues of material fact exist, and if not, whether the moving party is entitled to judgment as a matter of law. Alaska R.Civ.P. 56(c); *Shatting v. Dilling-*

*ham City School District*, 617 P.2d 9, 11 (Alaska 1980). In reaching this decision we must draw all reasonable inferences in favor of the non-moving party and against the movant. *Id.*

Drawing all reasonable inferences in the light most favorable to FMH, the record shows the following: at the time of Jackson's accident, FMH was the only civilian hospital north of Anchorage providing emergency room services in Alaska. Two road signs in Fairbanks note the location of the hospital. However, neither of these signs specifically refer to the existence of emergency room services. The signs were not constructed or situated by FMH. In fact, FMH does no advertising at all.

From the time of its establishment in 1972, FMH has never staffed its emergency room with its own physician employees, but has always relied upon local physicians to provide that service. Prior to the formation of ERI in 1977, FMH's emergency room was serviced by three local clinics, each providing one physician on a nightly basis. After 1977, ERI provided one physician on a nightly basis who worked a 14-hour graveyard shift (6:00 p.m. to 8:00 a.m.).[8] While on duty in the emergency room, the ERI physician was "in charge" and no FMH personnel were responsible for either scheduling or monitoring the emergency room physicians. No contractual arrangement existed between FMH and ERI for the provision of emergency room physicians.

In apparent non-life threatening situations the first person an incoming patient sees at the emergency room is the admissions clerk. Immediately adjacent to the clerk's desk is a sign which indicated that physicians from ERI were working in the emergency room. Although the exact state of Jackson's awareness is not entirely clear, there is evidence suggesting that he was admitted in a conscious state.[9] Nei-

8. The clinics continued to provide an additional physician for the graveyard shift on a rotation basis.

9. Jackson testified at his deposition that he recalled being placed in the helicopter but had no recollection of being removed from it, being

taken to FMH, or of meeting the doctor who treated him. On the other hand, the medical records indicate that Jackson appeared to be neurologically stable, completely oriented and gave no indication that he was unconscious or in distress. Moreover, at his deposition, Dr.

ther Jackson nor his mother selected FMH as the place of treatment nor Dr. Power as Jackson's physician.

 From the above, a jury could conclude that FMH held itself out as providing emergency care services to the public. A jury could also find that Jackson reasonably believed that Dr. Power was employed by the hospital to deliver emergency room service. It is also possible, however, that a jury could find to the contrary.[10]

Unless the evidence allows but one inference, the question of apparent authority is one of fact for the jury. *City of Delta Junction*, 670 P.2d at 1131; *Themins*, 637 P.2d at 159; *Adamski*, 579 P.2d at 978. In the case at bar, the record is not susceptible to a single inference. Thus, the trial court properly denied summary judgment on this issue.

### VI

Jackson's final point is that the trial court erred in refusing to rule, as a matter of law, that FMH, as a general acute care hospital, has a non-delegable duty to provide non-negligent physician care in its emergency room. In essence, Jackson's position is that when a hospital undertakes to operate an emergency room as an integral part of its health care enterprise, public policy dictates that it not be allowed to insulate itself from liability by shunting that responsibility onto another.

FMH, on the other hand, argues that a hospital does not have a non-delegable duty to guarantee safe treatment in its emergency room. Physicians, not hospitals, FMH asserts, have a duty to practice medicine non-negligently. Thus, according to FMH,

a hospital cannot be held to have delegated away a duty it never had.

The trial court ruled that "[t]here cannot be a non-delegable duty if there is no contractual relationship." Since it was unclear from the evidence whether or not there was any contractual relationship between ERI and FMH, the court denied Jackson's motion for summary judgment. Initially, we note the trial court's erroneous characterization of the issue. By holding that there can be no "non-delegable duty if there is no contractual relationship," the court confused the question of the existence of a duty with the issue of whether a duty is non-delegable. The flaw in this reasoning is self-evident. As FMH points out, a party cannot be held to have delegated away a duty it never had. Thus, the threshold question is whether FMH had a duty to provide emergency room care. Only if it did, is it necessary to determine what that duty entailed.

 FMH is licensed as a "general acute care hospital."[11] As such, it is required to comply with state regulations designed to promote "safe and adequate treatment of individuals in hospitals in the interest of public health, safety and welfare." AS 18.-20.060. These regulations provided, at the time of Jackson's accident, that an acute care hospital *shall* "insure that a physician is available to respond to an emergency at all times." Former 7 AAC 12.110(c)(2).[12] Thus, at a minimum, the law imposed a duty on FMH to provide emergency care physicians on a 24-hour basis.

FMH, however, voluntarily assumed a much broader duty. At the time of Jackson's accident, FMH was accredited by the

---

Power testified that "Jackson was talking" and "completely oriented."

10. In this regard, we agree with the weight of authority that application of apparent authority in the hospital/emergency room physician situation does not require an express representation to the patient that the treating physician is an employee of the hospital. Nor is direct testimony as to reliance required absent evidence that the patient knew or should have known that the treating physician was not a hospital employee when the treatment was rendered. *See* cases cited *supra* p. 1380.

11. A general acute care hospital is a "facility which provides hospitalization for inpatient medical care of acute illness or injury and obstetric care." 7 AAC 12.100.

12. In 1983, this regulation was amended to provide that "[a] general acute care hospital *must* provide ... [among other services not relevant here] emergency care services." 7 AAC 12.105 (emphasis added).

Joint Committee on the Accreditation of Hospitals (JCAH).[13] In order to receive and maintain accreditation,[14] FMH had to comply with the JCAH's standards promulgated in the *Accreditations Manual For Hospitals, Emergency Services.* Standard I mandates that all accredited hospitals implement a well defined plan for emergency care based on community need and the capability of the hospital. The JCAH standards also mandate, among other things, that: (1) FMH's emergency room be directed by a physician member of the active medical staff (Standard II); (2) FMH's emergency room be integrated with other units and departments of the hospital (Standard III); (3) that emergency care be guided by written policies and procedures; and (4) that the quality of care be continually reviewed, evaluated and assured through establishment of quality control mechanisms (Standard V).

Additionally, FMH's own bylaws provided for the establishment and maintenance of an emergency room. Article X, section 1(d)(1)(b) of FMH's Medical Bylaws provides for an emergency room as one of the services of the hospital. Article XI, section 3(e) provides for the creation of an emergency room committee which is required among other things to:

(a) formulate rules and regulations for the continuous coverage of the emergency room; and

(b) supervise the clinical work in that department.

■ Based upon the above, it cannot seriously be questioned that FMH had a duty to provide emergency room services and that part of that duty was to provide physician care in its emergency room. Having so determined, we must next ascertain whether FMH's duty to provide physician care in the emergency room is non-delegable. That is, we must determine whether, having assumed the duty to staff an emergency room, FMH should be allowed to avoid responsibility for the care rendered therein by claiming that the physicians it provides are not its employees. We conclude that it cannot.

■ A non-delegable duty is an established exception to the rule that an employer is not liable for the negligence of an independent contractor. W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on The Law of Torts,* § 71 at 511–12 (5th ed. 1984). According to the late Professor Prosser, such a duty "may be imposed by statute, by contract, by franchise or by charter, or by the common law." *Id.* Among the duties considered non-delegable are the following:

[T]he duty of a carrier to transport its passengers in safety, of a railroad to fence its tracks properly or to maintain safe crossings, and of a municipality to keep its streets in repair; the duty to afford lateral support to adjoining land, to refrain from obstructing or endangering the public highway, to keep premises reasonably safe for business visitors, to provide employees with a safe place to work; the duty of a landlord to maintain common passageways, to make repairs according to covenant, or to use proper

---

**13.** The JCAH was formed in the early 1950's by the American College of Surgeons, the American College of Physicians, the American Hospital Association, and the American Medical Association. Its purpose was to establish minimum hospital standards for patient care. For details of the program, see Dornette, *The Legal Impact on Voluntary Standards in Civil Actions Against the Health Care Provider,* N.Y.L.Sch.L.Rev. 925, 925–28 (1977); Holbrook & Dunn, *Medical Malpractice Litigation: The Discoverability and Use of Hospitals' Quality Assurance Committee Records,* 16 Washburn L.J. 54, 57 (1976).

**14.** Hospitals voluntarily seek accreditation for financial and professional prestige reasons. First, accreditation by the JCAH means the hos-

pital qualifies to participate in the federal Medicare and Medicaid programs. Accreditation by JCAH is deemed substantial compliance with the Medicare conditions of participation. 42 U.S.C. § 1395bb (1982); 42 C.F.R. § 405.1901(d) (1986). *See generally,* Dornette, *supra* n. 13 at 927, Holbrook & Dunn, *supra* n. 13, at 58. Second, JCAH accreditation is often a prerequisite to obtaining approval of internship and residency programs. *See generally, American Medical Association Directory of Accredited Residencies 3* (1975–76), *quoted in* Dornette, *supra* n. 13, at 928. Finally, the institution's reputation and standing in the community is affected by whether it receives JCAH accreditation. *See* Holbrook & Dunn, *supra* n. 13.

care in making them, and no doubt others.

*Id.* (footnotes omitted). However:

It is difficult to suggest any criterion by which the non-delegable character of such duties may be determined, other than *the conclusion of the courts that the responsibility is so important to the community that the employer should not be permitted to transfer it to another.*

*Id.* at 512 (emphasis added). *Accord, Alaska Airlines v. Sweat,* 568 P.2d 916, 925–26 (Alaska 1977).

Our principal decision on non-delegable duty is *Sweat,* 568 P.2d 916. In that case, Sweat sued Alaska Airlines for injuries sustained in an air crash while traveling aboard a Chitina Air Service plane. *Id.* at 922. Chitina had been engaged under a contract with Alaska Airlines to service a portion of Alaska Airlines' regularly scheduled routes. *Id.* at 921, 922. Alaska Airlines contended that Chitina was an independent contractor and therefore it was not liable for Chitina's negligence. *Id.* at 923. The trial court found Alaska Airlines vicariously liable based on Restatement (Second) of Torts § 428. *Id.* On appeal, we affirmed the trial court's decision on the alternative ground that Alaska Airlines owed a common law nondelegable duty of safety to its passengers. *Id.* at 925. We reasoned:

We believe that the responsibility of a common carrier for the safety of its passengers is so important that the carrier should not be permitted to transfer it to another. A scheduled common carrier such as Alaska is given a monopoly or semi-monopoly primarily for the purpose of furnishing safe and reliable scheduled air transportation. It should not be permitted to barter away its responsibility to the traveling public by means of contracts with other carriers. If this were permissible, an air carrier could avoid liability by engaging in independent contracts for furnishing food, maintenance of its planes and conceivably even for

supplying crews. Regardless of whether such contracts may be permitted by regulatory authorities, the traveling public is entitled to look for protection to the certificated carrier responsible for the scheduled route.

*Id.* at 926.

We have little trouble concluding that patients, such as Jackson, receiving treatment at a hospital emergency room are as deserving of protection as the airline passengers in *Sweat.* Likewise, the importance to the community of a hospital's duty to provide emergency room physicians rivals the importance of the common-carriers' duty for the safety of its passengers. We also find a close parallel between the regulatory scheme of airlines and hospitals. Undoubtedly, the operation of a hospital is one of the most regulated activities in this state. Besides the license,[15] and certificate of need,[16] requirements mentioned above, a hospital must comply with state regulations promulgated to control its activities, AS 18.20.070, 7 AAC 12.610; adopt a state approved risk management program "to minimize the risk of injury to patients," AS 18.20.075; and undergo "annual inspections and investigations" of its facilities, AS 18.-20.080. Failure to comply with these statutory requirements can lead to suspension or revocation of the hospital's license. AS 18.20.050.

The hospital regulatory scheme and the purpose underlying it (to "provide for the development, establishment, and enforcement of standards for the care and treatment of hospital patients that promote safe and adequate treatment" AS 18.20.010), along with the statutory definition of a hospital, (an institution devoted primarily to providing diagnosis, treatment or care to individuals, AS 18.20.130(3)), manifests the legislature's recognition that it is the hospital as an institution which bears ultimate responsibility for complying with the mandates of the law. It is the hospital that is required to ensure compliance with the regulations and thus, relevant to the instant case, it is the hospital that bears final ac-

---

**15.** *See* AS 18.20.020.

**16.** *See* AS 18.07.031.

countability for the provision of physicians for emergency room care. We, therefore, hold that a general acute care hospital's duty to provide physicians for emergency room care is non-delegable. Thus, a hospital such as FMH may not shield itself from liability by claiming that it is not responsible for the results of negligently performed health care when the law imposes a duty on the hospital to provide that health care.

We are persuaded that the circumstances under which emergency room care is provided in a modern hospital mandates the rule we adopt today. Not only is this rule consonant with the public perception of the hospital as a multifaceted health care facility responsible for the quality of medical care and treatment rendered, it also treats tort liability in the medical arena in a manner that is consistent with the commercialization of American medicine. Finally, we simply cannot fathom why liability should depend upon the technical employment status of the emergency room physician who treats the patient. It is the hospital's duty to provide the physician, which it may do through any means at its disposal. The means employed, however, will not change the fact that the hospital will be responsible for the care rendered by physicians it has a duty to provide.

■ This holding is necessarily limited. We do not change the standard of care with which a physician must comply, nor do we extend the duty which we find non-delegable beyond its natural scope. Our holding does not extend to situations where the patient is treated by his or her own doctor in an emergency room provided for the convenience of the doctor. Such situations are beyond the scope of the duty assumed by an acute care hospital. Rather our holding is limited to those situations where a patient comes to the hospital, as an institu-tion, seeking emergency room services and is treated by a physician provided by the hospital. In such situations, the hospital shall be vicariously liable for damages proximately caused by a physician's negligence or malpractice.

■ In the instant case, Jackson came to FMH as an institution seeking emergency room services. Dr. Power was a physician FMH had a non-delegable duty to provide. FMH is, therefore, vicariously liable as a matter of law for any negligence or malpractice that Dr. Power may have committed. Accordingly, the trial court's ruling on this issue must be reversed. Jackson is entitled to partial summary judgment on the issue of FMH's vicarious liability.

## VII

For the reasons outlined above, the trial court's denial of summary judgment on Jackson's theories of enterprise liability and apparent authority are AFFIRMED. However because we hold that FMH has a non-delegable duty to provide non-negligent physician care in its emergency room, the trial court's denial of summary judgment on the theory of non-delegable duty, is REVERSED and REMANDED with instructions to enter partial summary judgment on the issue of FMH vicarious liability in favor of Jackson.

AFFIRMED in part; REVERSED in part; and REMANDED.

MOORE, J., not participating.