NORCON, INC., Appellant,

v.

Mary KOTOWSKI, Appellee.

Mary Kotowski, Cross–Appellant,

v.

Norcon, Inc. and Veco, Inc.,
Cross–Appellees.

Nos. S–6390, S–6420.

Supreme Court of Alaska.

Feb. 19, 1999.

Donna C. Willard, Law Offices of Donna C. Willard, Anchorage, for Appellant and Cross–Appellees.

Robert John, Law Office of William Satterberg, Jr., Fairbanks, for Appellee and Cross–Appellant.

Before RABINOWITZ, MATTHEWS, and EASTAUGH, Justices.

## OPINION

MATTHEWS, Justice.

### I. INTRODUCTION

A jury found Norcon, Inc., liable to Mary Kotowski for sexual harassment, intentional infliction of emotional distress, and negligent infliction of emotional distress. It awarded her $8,494.40 for lost earnings and $1,850 for emotional distress. The jury also found Norcon liable for punitive damages and awarded $3,770,260.63. Foremost among the many issues presented are whether an award of punitive damages is justified, whether the award is excessive, and, if so, what an appropriate remittitur amount would be. We hold that the evidence warranted a punitive damages award, but that the existing award is excessive. We conclude that the maximum allowable punitive damage award is $500,000 and order a remittitur to that amount.

### II. FACTS

Most of the issues in this case require that we view the evidence in a light most favorable to Kotowski. Unless otherwise indicated, the facts set forth are presented from this perspective.

Mary Kotowski was one of thousands of workers employed to clean up the Exxon Valdez oil spill in Prince William Sound. Exxon employed Veco, Inc., to act as general contractor on the spill cleanup. Norcon, a sister corporation of Veco, was one of Veco's subcontractors. Exxon, Veco, and Norcon had a strict policy prohibiting the consumption of alcohol by anyone working on the spill or living in contractor housing.

Kotowski was dispatched by her labor union in Fairbanks to work for Norcon on June 15, 1989. After a day of orientation she was assigned to work aboard a shower barge attached to the vessel Pacific Northwest Explorer. She worked there for approximately two weeks without days off, working at least twelve hours each day. She slept on the Pacific Northwest Explorer.

Kotowski's immediate supervisor was Kathleen Brennan, who reported to Mike Posehn, a general foreman for Norcon. Both Brennan and Posehn were union members.

No incidents of importance occurred until June 28, 1989. On that date Posehn told Kotowski she should pack her gear and move to another barge, the Foss 280. Transportation to take her to the Foss 280 did not arrive until the next day. She thus went to the Foss 280 on June 29, checked in with security, and asked for her room assignment. She was told that she had not yet been assigned a room, but was taken to a work station where she busied herself.

Kotowski was working alone when Mike Posehn appeared with another individual. She testified that "he came up to me, he kissed me, he kind of squeezed my bottom, asked me how's it going, babe?" The kiss was on her lips. This was only the third or fourth time she had seen Posehn. Kotowski was distressed but she did not complain to Posehn. Subsequently she asked Posehn if there was specific work that she should be doing. He replied that she should ask "one of the girls running around out here ... if they need help with anything." Posehn and his companion then left. After spending the day working on the Foss 280, Kotowski returned to her room on the Pacific Northwest Explorer.

On the 30th, Kotowski returned to the Foss 280, sought out and found Posehn. Kotowski testified that she "needed some kind of direction to go and something to do other than just standing around or pretending I was busy." She told Posehn that if she wasn't needed on the Foss 280 there was work for her to do on the Pacific Northwest Explorer and requested that she be allowed to continue to work there. Posehn responded by inviting her to his room for further discussion. She complied. In his room, Posehn poured them both a drink of whiskey. While she took a sip, he consumed his drink. Posehn told her to calm down, take the afternoon off, and return to the Pacific Northwest Explorer for a nap. He invited her to return to his room in the evening for a party, and they could further discuss her employment then.

Kotowski returned to the Pacific Northwest Explorer. She discussed the events on the Foss 280 with Elmo Savell, the Exxon executive in charge of the cleanup task force. She told Savell that she was being harassed, that Posehn had a reputation for granting employment preferences in exchange for sex, that she had been invited to a party in Posehn's room that evening, and that she expected alcohol consumption to occur there. Savell furnished Kotowski with a tape recorder to enable her to record conversations at the party. Kotowski requested protection from being fired. Savell typed and signed the following note: "To whom it may concern. Ms. Mary [Kotowski], ... a Norcon employee, has agreed to assist in gathering information concerning alcohol/drug abuse aboard the Foss 280 barge. She is to be granted amnesty from prosecution and from being fired from her job."

Kotowski proceeded to the Foss 280 to attend the party. Upon boarding she was met by a woman who told her that Kotowski was transferred to the "beach," a less desirable assignment. The party was held in Posehn's room, which was adjacent to the room where Norcon's managers resided. The party was attended by numerous people including some Norcon managers. There was sexual banter at the party and alcohol was consumed. Posehn told Kotowski that although she had been assigned to the beach, he had changed the assignment.

Toward the end of the party the following colloquy took place between Kotowski and Posehn:

Kotowski: Oh, okay. So I'll be here at noon.

Posehn: Huh uh.

Kotowski: Huh uh?

Posehn: I haven't decided yet. Go ahead and have another drink. We'll decide by the time you finish that.

Kotowski: You want me to have another drink and then we'll decide by the time I leave, what time I get here?

Posehn: Right.

Kotowski: What might be that time (laughs) by the time I leave?

At approximately 11:00 p.m. Kotowski left the party to use the bathroom. When she returned to Posehn's room no guests were present and the lights were out. She opened the door and found Posehn standing in his underwear. She told him that she was leaving. Posehn invited her to spend the night. He was pushing the door closed when she yanked it open and left, leaving her hard hat, coat, and life vest in the room. She returned to the Pacific Northwest Explorer and delivered the tapes and the tape recorder to Savell's secretary.

The next day, Kotowski worked aboard the Pacific Northwest Explorer, assisting Savell's secretary. She talked to Savell briefly. He acknowledged that he had received the tapes and listened to parts of them.

On July 1, Ron Nelson, a Norcon executive who had attended Posehn's party, asked Dallas Wilmarth, a union steward, to ask Kotowski to sign a statement that she had been insubordinate to Norcon. Nelson promised that it would not affect Kotowski's job. Wilmarth complied, telling Kotowski that "I was guaranteed that your job wouldn't be terminated." After deliberating, Kotowski signed the statement. Wilmarth delivered the statement to Nelson, who was then lunching with other Norcon managers. He observed that "[p]retty quick they started passing that paper around, laughing about it, and I thought, oh boy, I think we're in trouble."

On July 2, Bill Arnold, Norcon's senior official in Prince William Sound, arrived by helicopter. After discussion with Savell and others, Kotowski was ordered to pack her bags and accompany Arnold to Valdez.

In Valdez, Kotowski was questioned by six people employed by Norcon, Veco, and their security contractor. She described the interrogation as "very hostile." She was apprehensive, nervous, and frightened. She testified that the interrogation lasted about four hours and that at times she cried. Afterwards, Kotowski was told that she could spend the night in the Norcon barracks. But she was concerned for her safety, and decided instead to sleep in a girlfriend's car. The next day she contacted Bill Arnold and asked what she should do next. He told her to "sit tight, relax, we'll figure something out." The next night she again slept in her friend's car. The next day she called Arnold and another Norcon employee and "requested that if I was going to be on hold, if I could go home to Fairbanks." Kotowski's request was approved and she returned to Fairbanks.

Norcon's manager on the Foss 280, Jerry Arnold, signed a termination slip for Kotowski on July 2, 1989. The note indicated that she had been terminated as of 5:30 p.m. "for leaving work here without permission." This termination slip was not, however, delivered to Kotowski. On July 6, 1989, Kotowski called Norcon to inquire about her status. She first spoke with a woman who told her she had been terminated for leaving the work site without permission. Subsequently, she spoke with Norcon's labor relations manager Gary Bacon, who told her that she had been terminated because she had broken camp rules. Kotowski testified that she was surprised by this because Bill Arnold had told her that she had not been fired. On July 10 a second termination slip was issued, stating that she was discharged for "breaking camp rules" and that she was not eligible for re-hire. Bill Arnold testified that Kotowski was terminated for drinking.

After interviewing Kotowski, Norcon interviewed Posehn. Although Posehn denied drinking with Kotowski, he said "and if we had had a drink that was after working hours." Neither Posehn nor anyone else—except Kotowski—was terminated for drinking, even though the identity of some people drinking at Posehn's party is evident from the tape. Posehn was terminated on July 10, 1989, after discovery of his sexual relationship on the barge with another female Norcon employee.

## III. *PROCEEDINGS*

Upon her termination, Kotowski filed a complaint with her union. The union refused to pursue her grievance because no dispute existed as to whether she had consumed an alcoholic beverage in violation of company policy. In February 1990 Kotowski filed a complaint in the superior court against Norcon, Exxon, and Veco.

Kotowski alleged that Norcon terminated her without just cause and withheld unpaid wages in breach of its collective bargaining agreement with her union. She also alleged that her transfer, discharge, and harassment constituted gender discrimination in the terms, conditions, and privileges of her employment. She raised numerous other claims against Norcon and alleged Veco's and Exxon's liability to her under various theories as well.[1]

Her claims went to trial. The jury found for Veco on all claims. Because the jury found that Kotowski failed to file suit against Norcon within the six-month limitations period, it did not address her claim that she had been discharged discriminatorily, or her claim that the discharge violated the implied covenant of good faith and fair dealing.

The jury found Norcon liable to Kotowski for sexual harassment and for intentional (IIED) and negligent (NIED) infliction of emotional distress. It awarded compensatory damages of $10,344.40 and punitive damages of $3,770,260.63. The superior court entered final judgment. Norcon appeals; Kotowski cross-appeals as to both Norcon and Veco.[2]

---

1. Kotowski settled with Exxon, which is not a party to this appeal.

2. Counsel for Norcon and VECO on appeal did not serve as their trial counsel.

## IV. DISCUSSION

### A. Pre-emption by the Labor Management Relations Act [3]

#### 1. The claims the trial court found pre-empted

■ The superior court concluded that Kotowski's "just cause" termination, sexual discrimination, and implied covenant of good faith and fair dealing claims were pre-empted by section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. The court concluded that these claims were subject to the grievance arbitration procedures of the LMRA. It interpreted the LMRA as requiring Kotowski to present these claims within six months of the date she knew or should have known that her union would not pursue her grievance.

Based on this interpretation, the superior court instructed the jury to proceed to the merits of Kotowski's "just cause" termination, sexual discrimination, and breach of the implied covenant of good faith and fair dealing claims only if it found that she had brought these claims within the six-month LMRA limitations period. The jury found that Kotowski had failed to proceed within the limitations period, and thus rejected these claims without addressing their merits.

The jury awarded $8,494.40 for lost earnings. Norcon contends that the trial court erred by including this award in the final judgment, in view of the court's ruling that Kotowski's wrongful termination claim was subject to the LMRA and the jury's determination that the LMRA limitations period had run.

The court also directed a verdict for the defendants on Kotowski's claims for unpaid wages, overtime, and penalties, finding that these claims likewise fell under the LMRA grievance procedure. On cross-appeal, Kotowski concedes that her "just cause" termination claim was subject to the LMRA statute of limitations, but argues that her sexual discrimination, good faith and fair dealing, unpaid wages, overtime, and penalties claims were not pre-empted.

#### 2. LMRA pre-emption

Section 301 of the LMRA pre-empts state law claims "founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'" *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987) (quoting *International Bhd. of Elec. Workers v. Hechler*, 481 U.S. 851, 859 n. 3, 107 S.Ct. 2161, 95 L.Ed.2d 791 (1987)). One of the primary goals of pre-emption is to ensure the effectiveness of arbitration. *See Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 219, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). Congress did not intend, however, for the LMRA to pre-empt "state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Id.* at 212, 105 S.Ct. 1904. States are free to create and enforce causes of action that vest rights in workers, so long as these rights can be adjudicated without having to interpret collective bargaining agreements (CBAs). *See Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 411–13, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988).

■ Before an employee may sue her employer for breach of a CBA, she must attempt to exhaust any grievance or arbitration remedies provided in the CBA. *See DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 163, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). A "wrongfully discharged employee may bring an action against his employer ... provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance." *Vaca v. Sipes*, 386 U.S. 171, 186, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). The jury found such a breach in this case. The statute of limitations for such an action is six months. *See DelCostello*, 462 U.S. at 169–172, 103 S.Ct. 2281. In contrast, if the employee's suit against her employer is

---

**3.** The question whether the LMRA pre-empts the enforcement of various state causes of action is a question of law. On questions of law, we do not defer to the lower court's decision, but adopt the rule of law most persuasive in light of precedent, reason, and policy. *See Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

based on state law claims neither founded on rights created by a CBA nor dependent on the analysis or interpretation of the CBA, the LMRA does not pre-empt such claims; the six-month limitations period thus does not apply.

### 3. The sexual discrimination claim

■ Kotowski alleged that Norcon had subjected her to sexual discrimination in violation of AS 18.80.220 through her transfer, her discharge, and the harassment directed at her.[4] The superior court agreed with Norcon's contention that, while Kotowski's sexual harassment claims were independent of the CBA, "any claim that she was terminated because of her sex, that similarly situated males were not terminated is a termination for other than just cause and could have been grieved under the collective bargaining agreement." Thus the jury received separate questions concerning sexual discrimination and harassment and answered the latter, but not the former, once it determined that the six-month LMRA limitations period had run.[5]

The superior court erred in preventing the jury from deciding Kotowski's discriminatory transfer and termination claim. The question of whether Kotowski's transfer and termination violated AS 18.80.220 "was a question of state law, entirely independent of any understanding embodied in the collective-bargaining agreement." *Livadas v. Bradshaw*, 512 U.S. 107, 125, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994). The right to a non-dis-

criminatory workplace conferred upon Kotowski by AS 18.80.220 could not be waived by any contrary contractual provision. Because it is a non-waivable state law right, no need exists to consult the CBA to determine its meaning.

We were presented with a similar situation in *Public Safety Employees Association v. State*, 658 P.2d 769 (Alaska 1983) (*PSEA*). In *PSEA*, we explored the relationship between a statutory right to sue under the Uniform Residential Landlord and Tenant Act (URLTA), AS 34.03, and language in a CBA requiring arbitration for disputes involving "the meaning or application of the express terms of the [CBA]." 658 P.2d at 772. We held that because "the right to sue under the act cannot be prospectively bargained away," it followed that "the contract remedy here cannot displace that which is provided by the act." *Id.* at 774–75. Thus the existence of the arbitration remedy did not preclude the exercise of the statutory remedy. *See id.* at 774.

Even if Norcon had just cause under the terms of the CBA to terminate Kotowski once she drank on duty, this fact would not make interpretation of the CBA necessary to resolve her sexual discrimination claim. The question whether Norcon sexually discriminated against Kotowski is a factual question as to motive: did Norcon transfer and terminate Kotowski because of her gender, or did it transfer and terminate her for drinking an alcoholic beverage in violation of the zero tolerance, alcohol-free workplace policy?[6]

---

**4.** AS 18.80.220(a) reads in part:

[I]t is unlawful for

(1) an employer to refuse employment to a person, or to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment because of the person's race, religion, color, or national origin, or because of the person's age, physical or mental disability, sex, marital status, changes in marital status, pregnancy, or parenthood when the reasonable demands of the position do not require distinction on the basis of age, physical or mental disability, sex, marital status, changes in marital status, pregnancy, or parenthood[.]

We have recognized a private right of action under AS 18.80.220. *See Ratcliff v. Security Nat'l Bank*, 670 P.2d 1139, 1142 (Alaska 1983).

**5.** The questions posed to the jury phrased the distinction as one between "sexual harassment"

on the one hand and whether Norcon sexually "discriminated against" Kotowski on the other. On the surface, this distinction would seem impossible to draw, since the allegations of harassment were pled as part of a discrimination claim under AS 18.80.220. The instructions to the jury, however, made clear that the "discrimination" question was directed specifically at Kotowski's transfer and termination. The jury was instructed that it could award damages for past lost earnings for "sexual harassment."

**6.** The superior court correctly instructed the jury that it could find for Norcon if Norcon "had a legitimate, nondiscriminatory reason for the plaintiff's transfer or termination," so long as the company "would have made the same decision regardless of gender." However, the jury did not reach this issue because it concluded that the six-month LMRA limitations period had run.

*See* AS 18.80.220(a)(1). Answering this question of motive does not require interpretation of the CBA.

Our conclusion is consistent with the Supreme Court's reasoning in *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 114 S.Ct. 2239, 129 L.Ed.2d 203 (1994). *Norris* involved a pre-emption question under the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.,* under which the Supreme Court applies the same pre-emption analysis as under the LMRA. *See* 512 U.S. at 260, 114 S.Ct. 2239. Norris was a mechanic who was terminated after he refused to sign an aircraft maintenance record certifying that repairs had been satisfactorily performed. *See id.* at 249–50, 114 S.Ct. 2239. Norris brought a state law wrongful discharge suit over this termination, which Hawaiian Airlines defended by arguing that resort to the CBA was necessary and Norris's suit therefore was pre-empted by the mandatory grievance procedures of the RLA. *See id.* at 250–51, 114 S.Ct. 2239.

In *Norris* the Court observed that purely factual questions about an employer's conduct and motives do not require interpretation of the CBA to answer. *See id.* at 261, 114 S.Ct. 2239. Because Norris's state law wrongful discharge claim involved this sort of factual determination, it was not pre-empted. *See id.* at 266, 114 S.Ct. 2239. Furthermore, the Supreme Court was not "persuaded by petitioners' contention that the state tort claims require a determination whether the discharge ... was justified by respondent's failure to sign the maintenance record, as the CBA required him to do." *Id.* While such a determination would have been necessary in a wrongful discharge claim alleging violation of the CBA, it was not necessary in the state law claim requiring only the purely factual determination of the employer's motive. *See id.*

Similarly, the jury could have addressed Kotowski's sexual discrimination claim by determining whether Norcon's transfer and termination of her were motivated by gender bias. The fact that Kotowski's alcohol consumption may have been just cause under the CBA for terminating her is no more relevant than the fact that Norris's refusal to sign maintenance records may have been just cause under the CBA to terminate him in *Norris.* The LMRA did not pre-empt Kotowski's sexual discrimination claim.

### 4. The breach of the implied covenant of good faith and fair dealing claim

Kotowski also claimed she was discharged in retaliation for investigating "safety violations," specifically, violations of the zero tolerance, alcohol-free workplace policy in effect during the cleanup. She claims that this retaliatory discharge breached the covenant of good faith and fair dealing implied in all employment contracts. *See Reed v. Municipality of Anchorage,* 782 P.2d 1155, 1158 (Alaska 1989) (*Reed II* ); *Knight v. American Guard & Alert, Inc.,* 714 P.2d 788, 792 (Alaska 1986).

The superior court agreed with Norcon that the implied covenant was a part of the contract, and that any claims alleging violations of the covenant were therefore claims brought under the CBA and pre-empted by the LMRA. Support for this view can be found in *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). In *Allis–Chalmers,* the Supreme Court reversed a decision of the Wisconsin Supreme Court which had held that a bad faith tort claim was not pre-empted by the LMRA, because it was based on an independent state law implied covenant of good faith and fair dealing. The Court observed that its pre-emption

> analysis must focus, then, on whether the Wisconsin tort action for breach of the duty of good faith as applied here confers nonnegotiable state-law rights on employers or employees independent of any right established by contract, or, instead, whether evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract.

471 U.S. at 213, 105 S.Ct. 1904. It found that "[b]ecause the right asserted not only derives from the contract, but is defined by the contractual obligation of good faith, any attempt to assess liability here inevitably will involve contract interpretation." *Id.* at 218, 105 S.Ct. 1904. Thus the LMRA pre-empted

Lueck's state law claim. *See id.* at 218–19, 105 S.Ct. 1904.

The Supreme Court's analysis of the relationship between the bad faith tort claim, the implied covenant, and the contract in *Allis–Chalmers* is inapplicable to the present case, however. In *Allis–Chalmers* the issue was whether an employer who ordered periodic insurance cutoffs and medical reexaminations had acted in bad faith. The Court found that "under Wisconsin law it appears that the parties to an insurance contract are free to bargain about what 'reasonable' performance of their contract obligation entails." *Id.* at 217, 105 S.Ct. 1904. Thus the employee's claim could not be resolved without referring to the terms of the contract, since the reasonableness of the cutoffs and reexaminations could only be determined by consulting such terms. In contrast, the implied covenant claim here requires no contractual interpretation.

■■■ We have recognized that a retaliatory discharge gives rise to a cause of action for breach of the duty of good faith and fair dealing. *See Reed II,* 782 P.2d at 1158. "[T]he public policy approach is largely encompassed within the implied covenant of good faith and fair dealing." *Knight,* 714 P.2d at 792. The fact that the "whistle blower" claim in this case involved the violation of a privately enforced safety policy, rather than violations of law, is irrelevant insofar as public policy favors safe workplaces. Kotowski still can bring an action for breach of the implied covenant of good faith and fair dealing if her termination was in retaliation for her reporting breaches of Exxon's zero tolerance, alcohol-free workplace policy. The CBA is irrelevant in adjudicating such an action; Kotowski and Norcon could not have contracted away Kotowski's right to report safety violations, even had they tried to do so. Nothing in the CBA could have altered, circumscribed, or defined this right. The implied covenant claim at issue can be distinguished from implied covenant claims of the sort found in *Allis–Chalmers* insofar as it rests on a non-negotiable right. Because the

contours of this right are not defined through the bargaining process, they can be traced out without any reference to the CBA.

The United States Court of Appeals for the Ninth Circuit explored the relationship between the LMRA and the Alaska implied covenant of good faith and fair dealing in *Eldridge v. Felec Services, Inc.,* 920 F.2d 1434 (9th Cir.1990). In *Eldridge,* the court examined Alaska cases [7] and accurately concluded that we treat retaliatory discharge claims as violations of the implied covenant of good faith and fair dealing, that the state policy on such discharges is non-negotiable, and that Eldridge's state law implied covenant claim did not depend on any interpretation of the CBA. *See id.* at 1436–39. The court concluded that the implied covenant claim in that case was distinguishable from the one in *Allis–Chalmers* where the "scope of the duty ... was defined by the express terms of the collective bargaining agreement itself." *Id.* at 1438. As the court observed:

> To defend the claim against it, Felec Services need only show that it was motivated to discharge Eldridge for reason other than to retaliate for the assertion of rights under the Alaska Workers' Compensation Act. It is irrelevant whether the company's reliance on the labor agreement was reasonable or whether its interpretation of the agreement was correct.

*Id.* at 1439. The court's reasoning is both persuasive and applicable to Kotowski's claim.

Furthermore, the Supreme Court has found other state law retaliatory discharge and public policy claims sufficiently independent under the LMRA pre-emption analysis. *See Norris,* 512 U.S. at 266, 114 S.Ct. 2239; *Lingle,* 486 U.S. at 407, 108 S.Ct. 1877. The fact that these cases involved causes of action based in tort, while breach of the implied covenant of good faith and fair dealing is an action based in contract, is irrelevant. Courts applying the LMRA pre-emption analysis should not "elevate form over substance," but instead determine whether the adjudication of the right at issue requires

**7.** *Reed v. Municipality of Anchorage,* 782 P.2d 1155 (Alaska 1989); *Luedtke v. Nabors Alaska Drilling, Inc.,* 768 P.2d 1123 (Alaska 1989);

*Knight v. American Guard & Alert, Inc.,* 714 P.2d 788 (Alaska 1986).

interpretation of the CBA. *See Allis–Chalmers,* 471 U.S. at 211, 105 S.Ct. 1904; *Eldridge,* 920 F.2d at 1437. Kotowski's implied covenant of good faith and fair dealing claim was not pre-empted by the LMRA because it required no such interpretation.

### 5. *The unpaid wages, overtime, and penalties claim*

Kotowski argues that her unpaid wages, overtime, and penalties claim had an independent basis in state law, was not dependent on the CBA, and should not have been taken from the jury. She bases this claim on AS 23.05.140.[8]

Alaska Statute 23.05.140 confers on an employee an independent statutory right that requires no CBA interpretation to adjudicate.[9] As the Supreme Court has said in analyzing a similar California statutory right, "the primary text for determining whether [the plaintiff] was entitled to a penalty was not the [CBA], but a calendar." *Livadas,* 512 U.S. at 124, 114 S.Ct. 2068.

■ Insofar as Kotowski and Norcon might disagree on the applicable wage rate, and on the degree that Kotowski might claim that she was owed extended post-discharge pay or other special payments under the CBA, such claims would be pre-empted by the LMRA since their adjudication would require interpretation of the CBA. Insofar as Kotowski merely demands unpaid wages and overtime pay she never received, however, her claims could be adjudicated without reference to the CBA, as could the issue of any statutory penalties also owed. These claims were not pre-empted by the LMRA, and the superior court erred in directing a verdict concerning them.

■ The superior court did not err when it included the $8,494.40 award for lost earnings in Kotowski's judgment. Under the affirmative answers given in the special verdict, the award addressed damages legally caused by sexual harassment.[10] Kotowski's lost earnings claims under other theories need not be retried as she has received what presumably is a full award of lost earnings. She is, however, entitled to a trial on her unpaid wages, overtime, and penalties claims.

### B. *Admission of the Ford Memo and Virginia Perry's Testimony*
#### 1. *The Ford memo*

■ Kotowski's Exhibit 7 is a three-page, handwritten memo from Bruce Ford, an investigator with Purcell Security, to Tom Varnell, his superior. Veco had contracted with Purcell to provide security for the cleanup, which included the investigation of allegations of rulebreaking on the cleanup vessels. The Ford memo summarizes the information

---

8. AS 23.05.140 provides in part:

 (b) If the employment is terminated, regardless of the cause of termination, all wages, salaries, or other compensation for labor or services become due immediately and shall be paid within three working days after the termination....

 ....

 (d) If an employer violates (b) of this section by failing to pay within three working days of termination, the employer may be required to pay the employee a penalty in the amount of the employee's regular wage, salary, or other compensation from the time of demand to the time of payment, or for 90 working days, whichever is the lesser amount.

9. In *Reed v. Municipality of Anchorage,* 741 P.2d 1181, 1185 (Alaska 1987) (*Reed I*), we found that a cause of action that included a claim under AS 23.05.140 alleged a breach of a CBA for statute of limitations purposes. We concluded that the employee's cause of action was not "strictly or solely an action for liability based upon a statute" since the CBA contained the specified wage rate, and "a failure to pay the specified wage would be a violation of the [CBA]." *Id.*

 The conclusion reached in *Reed I* does not control however, since it was not based on the same considerations applicable in a LMRA pre-emption analysis. In *Reed I,* it was sufficient to ask whether the failure to pay wages pursuant to AS 23.05.140 might also constitute a breach of the CBA; because the CBA established the wage rate, a failure to pay the wages contained therein would constitute such a breach. LMRA pre-emption questions require a different sort of analysis, however. Here we must ask whether the resolution of Kotowski's AS 23.05.140 claim would require the *interpretation* of the CBA. *See Lingle,* 486 U.S. at 411–13, 108 S.Ct. 1877. The CBA needs to be consulted to determine the applicable wage rate. However, unless the language setting forth the wage rate is subject to conflicting interpretations, there will be no need to actually interpret or construe the terms of the CBA to determine the rate.

10. *See* note 5, *supra.*

Ford and fellow Purcell employee Mark Flechsing had gathered concerning Kotowski, Posehn, and other Norcon employees between July 2, 1989, and July 5, 1989. Kotowski offered the memo into evidence to prove the truth of the matters asserted in the following portion of the memo:

Re: Mike Posehn. I talked with two roommates of Mike Posehn at the Foss 280 Rm. 235. The individuals were Jim Stampley and Mark Ruder and both Norcon employees. Stampley said that Posehn did have a lot of female visitors in his room and there was drinking of alcoholic beverages as a supervisor as a "springboard" for sexual activity with the females under his supervision.

I also talked with Sgt. Mark Flechsing who is the head of security for Purcell at the Midway Barge. Flechsing said he had talked to Larry Coyle, one of the head supervisors for Norcon, concerning Posehn. Coyle told Flechsing that Posehn would do favors for some of his female crew in exchange for some sort of sexual activity. Coyle is now on R & R and is unavailable to be interviewed.

Norcon objected, arguing that this memo was inadmissible hearsay. Kotowski argued that the memo fell within the business records exception to the hearsay rule. *See* Alaska R. Evid. 803(6). Norcon also contested this, in part because the memo was an investigative report containing the hearsay statements of others. The superior court admitted the memo under the business records exception.

The business records exception to the hearsay rule allows the admission of hearsay evidence that is:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnosis, made at or near the time by, or from information transmitted by, a person with knowledge acquired of a regularly conducted business activity, and if it was the regular practice of that business activity to make and keep the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

Alaska R. Evid. 803(6).

On appeal Norcon does not contest the superior court's implicit findings that Ford acquired his information as part of a regularly-conducted business activity, and that it was Purcell's regular practice to make and keep memoranda of this type. Instead, Norcon objects to the fact that the memo consisted of the "double and triple hearsay" of Coyle and Stampley, the informants who provided the information contained in the memo. According to Norcon, even if Ford acted within the regular course of business in preparing the memo, no indication exists that these informants were acting within the regular course of their business. Norcon refers this court to the commentary on Rule 803(6), which reads in part:

Sources of information present no substantial problem with ordinary business records. All participants, including the observer or participant furnishing the information to be recorded, are acting routinely, under a duty of accuracy, with employer reliance on the result, or in short "in the regular course of business." If, however, the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy does not extend to the information itself, and the fact that it may be recorded with scrupulous accuracy is of no avail.

Alaska R. Evid. 803(6) commentary.

Kotowski argues that Coyle and Stampley had business reasons, as employees of Norcon, to provide accurate and truthful responses. She argues alternatively that the testimony of these informants should be regarded as non-hearsay, as admissions of a party-opponent. Alaska R. Evid. 801(d)(2).[11]

11. Rule 801(d)(2) provides that such admissions are admissible as non-hearsay. A statement may be considered the admission of a party-opponent when:

The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity, or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a

This alternative argument rests on the assumption that because Coyle and Stampley were "supervisory and safety employees," their statements concerned a matter within the scope of their agency or employment. *See* Alaska R. Evid. 801(d)(2)(D).

In its reply brief, Norcon does not contest the admissibility of the Ford memo based on this alternative theory. In our view, the alternative argument has merit. To use the terms of Rule 801(d)(2), both Coyle and Stampley were agents speaking at a time that they were employed by Norcon. As supervisors and safety employees, alcohol use and sexual harassment are apparently matters which their jobs required them to report, especially in response to an employer-initiated investigation. We therefore conclude that it was not error to admit the Ford memo.

### 2. *Virginia Perry's testimony*

■ Virginia Perry was a Norcon employee and foreman of a crew working on the oil spill cleanup. Her supervisor was Posehn. She was allowed to testify that Posehn had made sexual advances to her, that she had rejected them, and that he had retaliated by humiliating her in front of her crew and giving her and her crew difficult work assignments. She testified that the women Posehn was "close to" were given the "cushy jobs." She said that she was unaware of any Norcon procedures for reporting sexual harassment, that if such procedures existed she would have used them, and that she and her crew were terrified by Posehn.

Norcon argues that Perry's testimony was "far more prejudicial than probative" and the

court should have excluded it under Evidence Rule 403.[12]

Norcon apparently never objected to the portions of her testimony outlined above.[13] Under these circumstances, we consider this point waived. *See Williams v. Utility Equip., Inc.*, 837 P.2d 1112, 1116–17 (Alaska 1992).

### C. *The Exclusive Remedy Provision of the Alaska Workers' Compensation Act*

■ Norcon argues that Kotowski's entire claim was barred by AS 23.30.055, which provides that an employer's liability for a worker's compensation under AS 23.30.045 "is exclusive and in place of all other liability of the employer and any fellow employee to the employee." One of Kotowski's responses to this argument is that it was not timely raised. The exclusive remedy defense was raised below for the first and only time in one sentence as part of Norcon's reply memorandum in support of its motion for JNOV.[14]

In *Veco v. Rosebrock*, 970 P.2d 906 (Alaska 1998), we held that claims of sexual harassment under Alaska's anti-discrimination statute may include damages for emotional distress and that such claims are not barred by the exclusive remedy provision of the Workers' Compensation Act. *Veco*, at 921–22. Further, we held in *Cameron v. Beard*, 864 P.2d 538, 545 n. 9 (Alaska 1993), that claims for lost wages due to breach of an employment contract are not barred by the exclusivity provision.

But Kotowski's tort claims for IIED and NIED might have been subject to that defense had the defense been timely raised. *See Elliott v. Brown*, 569 P.2d 1323, 1325–27

---

statement by a person authorized by the party to make a statement concerning the subject, or (D) *a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship*, or (E) a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy.

Alaska R. Evid. 801(d)(2) (emphasis added).

**12.** Evidence Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the

issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**13.** Norcon did object to Perry's testimony that Posehn had discriminated against her on racial grounds. The court sustained this objection.

**14.** Appellate Rule 212(c)(8)[c] requires that appellant's brief indicate the pages of the record where each point on appeal was raised in the trial court. Norcon has not complied with this rule with respect to the exclusive remedy contention.

(Alaska 1977) (exclusive remedy clause bars suit against employer for intentional tort committed by co-employee, suit against co-employee not barred). As it was, however, Norcon permitted these claims to go to the jury without objection based on the exclusivity clause. This failure is important because the jury's award of emotional distress damages might be ascribable either to Kotowski's sexual harassment claim or her IIED and NIED tort claims. An award under the last two theories, but not the first, might be barred. A timely objection, if granted, would have eliminated the need to speculate as to whether the jury's award was attributable to the permissible or the possibly barred theories. We therefore conclude that the exclusive remedy defense was not timely raised below. It is therefore waived on appeal.

#### D. Offsetting the Exxon Settlement from the Compensatory Damages Award

█ Kotowski prevailed on her sexual harassment, IIED, and NIED claims. Kotowski also raised similar claims against Exxon.[15] She eventually settled with Exxon for $20,000. Kotowski was awarded compensatory damages for emotional distress and lost earnings. These elements of damage were also claimed from Exxon. Norcon argues that the compensatory damage award must be offset by the amount of the Exxon settlement in order to avoid a double recovery. We agree. See Navistar Int'l Transp. Co. v. Pleasant, 887 P.2d 951, 957–58 (Alaska 1994).

#### E. Substantial Evidence of Sexual Harassment

█ Norcon contends that the evidence was insufficient to warrant submission of the issue of sexual harassment to the jury. The jury was instructed on claims for "hostile environment sexual harassment" and "quid pro quo sexual harassment." The basic elements of the former theory were encompassed in Instruction No. 21, which outlined the following elements that Kotowski had to prove:

**15.** While Kotowski did not raise a sexual harassment claim against Exxon under AS 18.80.220, as she did against Norcon, she claimed that

(1) that she was subjected to sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature,

(2) that this conduct was unwelcome,

(3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and to create an abusive working environment, and

(4) that she suffered damages as a result of the sexual harassment.

The elements of the quid pro quo claim were encompassed in Instruction No. 24. Kotowski was required to prove:

(1) that she was subjected to sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature;

(2) that this conduct was unwelcome; and

(3) either (a) that submission to such conduct was made either explicitly or implicitly, a term or condition of her employment, or (b) that her submission or rejection of such conduct was used as the basis for an employment decision or decisions affecting her employment; and

(4) that she suffered damages as a result of the sexual harassment.

We find the evidence was sufficient to present claims under both theories. Viewed most favorably to Kotowski, evidence existed that she was subjected to unwelcome sexual advances, requests for sexual favors, and physical conduct of a sexual nature. The jury could reasonably conclude that these acts were sufficiently severe (if not pervasive from the standpoint of Kotowski) to create a hostile working environment. Given the evidence that Posehn was trading favorable assignments for sex, Posehn's sexual conduct toward Kotowski, Kotowski's assignment to the Foss 280, her reassignment to the beach, and Posehn's cancellation of that assignment can reasonably be viewed as "decisions affecting her employment." Thus there was also evidence of quid pro quo sexual harassment.

Exxon was liable to her under AS 18.80.260 for "aiding and abetting sex discrimination."

Norcon also argues that Kotowski was required to prove that Posehn "was aided in accomplishing the tort by existence of the agency relation." Norcon states that Kotowski failed to prove this.

In *Veco,* we held that an employer may be vicariously liable for acts of a supervisor who creates a hostile working environment even where the acts are outside the scope of the supervisor's employment:

> Harassment by supervisors is facilitated, made more serious, and is less apt to be reported because supervisors are "understood to be clothed with the employer's authority." [*Meritor Savings Bank v. Vinson,* 477 U.S. 57] at 77 [106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)]. The Restatement (Second) of Agency § 219(2)(d) supports imposing vicarious liability in such circumstances. It provides:
>
> > (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
> >
> > . . . .
> >
> > (d) the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, *or he was aided in accomplishing the tort by the existence of the agency relation.*

*Veco,* 970 P.2d at 911.

But the jury was not instructed on this theory in the present case. Instead, there were two other theories on which the jury might have held Norcon liable for sexual harassment. Under Instruction No. 25 the first was if Norcon had actual or constructive knowledge of the harassment and failed to take prompt and adequate remedial measures. Under Instruction No. 28 the second was if Posehn was acting within the course and scope of his employment. Norcon does not challenge the substance of either instruction in this appeal. But it argues that Instruction No. 25 should not have been given because it was unwarranted by the evidence.

▇▇▇ The evidence was sufficient to justify a finding that Norcon knew or should have known of Posehn's sexual harassment of female employees and took no remedial measures. Posehn had several victims. He roomed and partied next door to Norcon's managers, some of whom partied with him. Norcon had not communicated instructions to its employees concerning what to do in cases of sexual harassment. When Kotowski, through Savell, complained of sexual harassment, Norcon turned a deaf ear to the substance of her complaint. Thus Instruction No. 25 was warranted by the evidence.[16]

### F. *Intentional and Negligent Infliction of Emotional Distress*

#### 1. *The IIED claim*

Citing *Richardson v. Fairbanks North Star Borough,* 705 P.2d 454, 456 (Alaska 1985), Norcon claims that the trial court "apparently failed to make" a threshold determination as to whether the severity of the emotional distress claimed by Kotowski and the conduct of Norcon warranted an IIED claim. *Richardson* does not hold that a trial court must make formal findings, but rather that it "should make" the actual determination itself. *See id.* Here, the determination is implicit in the fact of submission of the IIED claim to the jury.

We thus proceed to the question whether the evidence was such that submission of the IIED claim was justified. Norcon claims that there was no proof of two of the essential IIED elements set forth in *Cameron v. Beard,* 864 P.2d 538, 548 (Alaska 1993), namely: (1) extreme and outrageous conduct, and (2) severe distress.

▇▇▇ We disagree. Posehn's sexual harassment of Kotowski can reasonably be characterized as extreme and outrageous. The jury was instructed that Norcon could be responsible for this on a vicarious liability theory if Posehn was acting within the scope of his employment, or on a theory of

---

16. Norcon does not contend that Instruction No. 28, encompassing the scope of employment theory, was unsupported by the evidence. With respect to quid pro quo harassment it clearly was justified. *See Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (employers liable for supervisors' sexually motivated employment actions such as hiring, firing and work assignments).

actual or constructive knowledge and failure to remedy. As discussed above, the evidence justified instructing on these theories. Furthermore, as we explain in discussing whether punitive damages were warranted, Norcon's actions toward Kotowski after her report to Savell can reasonably be regarded as extreme and outrageous.

■■■ With respect to the degree of the emotional distress suffered by Kotowski, we think the jury might reasonably find it to be severe. A person working in an isolated location would naturally suffer a great deal of distress upon learning that the nature of her work assignments would be dependent on whether she submitted to a supervisor's sexual advances. And this distress would be exacerbated if, upon making an effort to report the situation, she found that she, rather than the supervisor, had become the target of the employer's investigation. This was the position Kotowski perceived herself to be in. She testified that she found it so distressing that she was afraid to sleep in the housing supplied by Norcon in Valdez, opting instead to spend two nights in a car.

For these reasons we conclude that the trial court did not err in submitting the IIED claim to the jury.[17]

### 2. *The NIED claim*

The superior court instructed the jury that an NIED claim requires some physical injury in addition to severe emotional distress. Norcon argues that the physical harm alleged by Kotowski was insufficient for a jury finding of NIED liability, and that the court should have directed a verdict on this issue.

■■■ Norcon may be correct that the physical phenomena testified to by Kotowski, headaches and sleeplessness, did not suffice to justify submission of the NIED claim to the jury. But if error occurred, it was harmless because the jury found that Norcon was responsible for intentional infliction of emotional distress. Negligent infliction is sub-

sumed within intentional infliction and no proof of physical injury is required for an IIED claim.[18]

### G. *Punitive Damages*

Norcon argues that insufficient evidence existed to present the question of punitive damages to the jury and, alternatively, that the jury's award of punitive damages was excessive and requires remittitur. We turn first to whether the evidence was sufficient to justify submission to the jury.

#### 1. *Evidence justifying submission of punitive damages to the jury*

The trial court instructed the jury that punitive damages could be awarded only if the jury concluded that Norcon's conduct was "outrageous." Outrageous conduct in turn was defined as conduct which is "the result of maliciousness or hostile feelings toward the plaintiff, or was undertaken with reckless indifference to the interests, rights, or safety of others." Kotowski was required to prove outrageousness by clear and convincing evidence. Punitive damages against Norcon were permitted only with respect to Kotowski's sexual harassment, IIED, and NIED claims. The court gave a supplemental instruction concerning the amount of punitive damages. The instruction specified certain factors which the jury could consider:

> The law provides no fixed measure as to the amount of punitive damages, but leaves it to you to decide an amount that will fairly accomplish the purposes of punishment and deterrence. In assessing such damages you may consider the magnitude and flagrancy of Norcon, Inc.'s offense, the importance of the policy violated, the wealth of Norcon, Inc., and the amount of compensatory damages.

Norcon does not challenge the court's instructions. Instead, it makes a conclusory factual argument that "the relatively minor incidents of alleged harassment experienced

**17.** On cross-appeal, Kotowski claims that the trial court erred by striking the word "reckless" from the IIED instruction. Kotowski is correct that recklessness may provide sufficient culpability for IIED liability. *Richardson*, 705 P.2d at 456. Still, the error was harmless, since the jury

found Norcon liable, even after it was given an instruction requiring intent.

**18.** We note that the jury made no award for physical injury.

by Kotowski simply are not sufficient to support [any award of punitive damages]." We reject this argument. As previously discussed, the sexual harassment by Posehn can reasonably be regarded as outrageous.

■ Norcon also argues that the sexual harassment by Posehn was neither known to nor authorized by management and therefore Norcon cannot be liable for punitive damages attributable to Posehn's harassment. Norcon contends that an employer may be liable for punitive damages for sexual harassment only in the event of actual participation or willful indifference by upper management. But "willful indifference" is a standard different from and more demanding than the "reckless indifference" standard in the jury instruction. Since the correctness of this instruction has not been made an issue, the appropriate question which we must answer is whether the evidence could support a jury conclusion that Norcon management was recklessly indifferent to the dangers of sexual harassment on the oil spill cleanup project. We answer this question in the affirmative given the pervasiveness of Posehn's conduct, Norcon's managers' association with Posehn in his illicit partying, Norcon's failure to communicate an anti-sexual harassment policy, and Norcon's response to the information conveyed to Savell.

■ Further, the jury was authorized to attribute Posehn's acts to Norcon if it found that Posehn was acting within the course and scope of his employment. Quid pro quo sexual harassment entailing employment decisions made by a supervisor generally is within the scope of the supervisor's employment.[19] In such circumstances, the supervisor's intentional acts of sexual harassment are attributable to the employer. Under the instructions given, Norcon's liability for Posehn's acts within the scope of his employment was not limited to compensatory damages. In this respect the instructions comport with prior case law which indicates that punitive damages may be awarded against an employer for the acts of employees within the scope of their employment. *See, e.g., Alaskan Village, Inc. v. Smalley,* 720 P.2d 945, 948–49 (Alaska 1986).

■ There is another basis by which Norcon could have been found liable for punitive damages. The tort of intentional infliction of emotional distress will support an award of punitive damages. Under the court's instructions, the elements of this tort were (1) intentional conduct (2) which is extreme or outrageous (3) and which caused severe emotional distress or bodily harm. These elements could reasonably have been found satisfied by the facts underlying Kotowski's "whistleblower" claim. After Kotowski reported sexual harassment and alcohol consumption to Savell, Norcon responded by firing Kotowski rather than addressing her claims on their merits. And the manner in which Norcon acted made the situation worse. It used pretextual reasons for firing her, broke explicit promises that she would not be fired, and subjected her to a lengthy and hostile interrogation.

We thus conclude that the issue of punitive damages was properly submitted to the jury on three theories: reckless indifference to sexual harassment on the part of Norcon, vicarious liability for acts of Posehn within the scope of his employment, and the tort of intentional infliction of emotional distress arising out of Norcon's treatment of Kotowski after she reported her concerns to Savell.

### 2. *Excessiveness of the punitive damages award*

Norcon argues that the $3,770,260.63 award of punitive damages is excessive. Norcon contends that the ratio of punitive to compensatory damages, 361.12 to 1, is so disproportionate as to require reduction. Further, Norcon argues that its wealth and earnings do not warrant the punitive damages award. Norcon argues that the punitive award essentially deprived it of all of its earnings for the past three years and more than half of the stockholder's equity as of 1993.[20]

**19.** *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

**20.** Norcon supplies a table of its gross revenue, pre-tax net profit, and equity as follows:

Kotowski responds by arguing that at most the ratio of compensatory to punitive damages is one among many factors which a reviewing court should consider in determining whether an award of punitive damages is excessive. Kotowski also contends Norcon's argument that its wealth and earnings do not justify the award lacks merit since it ignores the profits Norcon made on the oil spill reflected in 1990. Further, she argues that there are no set rules of proportionality between punitive damages and earnings or equity.

 This court reviews jury awards of punitive damages for excessiveness. *Alaskan Village, Inc. v. Smalley*, 720 P.2d 945, 949 (Alaska 1986). "A punitive damage award is excessive if it is manifestly unreasonable." *Id.* Where we find an award to be excessive we will vacate the award and may order a remittitur. *See Sturm, Ruger & Co. v. Day*, 615 P.2d 621, 624 (Alaska 1980). The amount on remittitur should be the maximum amount which the jury could have awarded which would not be excessive. *See Exxon*

| Fiscal Yr. | Gross Revenue | Pre–Tax Net Profit | Equity |
|---|---|---|---|
| 1990 | 106,017,945 | 19,843,477 | 20,333,201 |
| 1991 | 20,779,818 | 949,944 | 6,090,140 |
| 1992 | 16,459,596 | 809,624 | 6,899,764 |
| 1993 | 27,726,321 | 1,023,167 | 7,922,933 |

**21.** Effective August 1997, the legislature enacted a statute which provides both standards and maxima for punitive damage awards. The jury is directed to consider the following factors in determining the amount of punitive damages

(1) the likelihood at the time of the conduct that serious harm would arise from the defendant's conduct;

(2) the degree of the defendant's awareness of the likelihood described in (1) of this subsection;

(3) the amount of financial gain the defendant gained or expected to gain as a result of the defendant's conduct;

(4) the duration of the conduct and any intentional concealment of the conduct;

(5) the attitude and conduct of the defendant upon discovery of the conduct;

(6) the financial condition of the defendant; and

(7) the total deterrence of other damages and punishment imposed on the defendant as a result of the conduct, including compensatory and punitive damages awards to persons in situations similar to those of the plaintiff and the severity of the criminal penalties to which the defendant has been or may be subjected.

*Corp. v. Alvey*, 690 P.2d 733, 742 (Alaska 1984) ("[M]aximum possible recovery approach is more appropriate in a remittitur context, because it comes closer to approximating the decision made by the jury."). Factors relevant in determining whether a punitive award is excessive "include the compensatory damage amount, magnitude of the offense, importance of the policy violated, and the defendant's wealth." *Alaskan Village*, 720 P.2d at 949.[21]

Kotowski correctly suggests that there is no definitive ratio between compensatory and punitive damages which establishes excessiveness. In *Cameron v. Beard*, 864 P.2d 538, 544 (Alaska 1993), a compensatory damage award for IIED of $1,000 was assessed against individual defendants. A punitive damage award of $70,000 was assessed against one of the defendants. *See id.* This was attacked as excessive and the suggestion was made that the punitive award should be reduced to a three to one ratio. *See id.* at 550. We rejected the argument, stating that we have

AS 09.17.020(c). In general, punitive damages may not exceed the greater of three times the amount of compensatory damages or $500,000. *See* AS 09.17.020(f). However, this cap may be exceeded where the conduct in question was motivated by financial gain and an actual knowledge standard is met. In such cases the cap on punitive damages may not exceed the greatest of four times the amount of compensatory damages, four times the aggregate amount of financial gain resulting from the misconduct, or $7,000,000. *See* AS 09.17.020(g). Notwithstanding the foregoing provisions, an action under AS 18.80.220 for unlawful employment practices, including sexual harassment, is capped at $200,000 if the employer has fewer than 100 employees in the state, $300,000 if the employer has between 100 and 200 employees, $400,000 if the employer has between 200 and 500 employees, and $500,000 if the employer has 500 or more employees in the state. *See* AS 09.17.020(h). The statute applies to all cases accruing after its effective date, August 7, 1997. Ch. 26, § 55, SLA 1997.

We are foreclosed from drawing on the statute as a source of public policy applicable to cases accruing before the effective date because the legislature declared its intent "as a matter of public policy to ... ensure that this act does not apply to or in any way have an effect on existing litigation or a civil cause of action that accrues before the effective date of this Act." Ch. 26, § 1, SLA 1997.

refused to prescribe a definite ratio between compensatory and punitive damages. Though comparing punitive and actual damage awards is one way to determine if punitive damages are ·excessive, other factors, such as the magnitude and flagrancy of the offense, the importance of the policy violated, and the defendant's wealth, are equally important to the determination.

*Id.* at 551 (citations omitted). In *Sturm, Ruger,* 615 P.2d at 624 n. 3, we noted that the relationship between punitive and compensatory damages was "a factor" but "there may be cases in which it is only of slight value or is totally inapplicable." In this case we consider the high ratio between punitive and compensatory damages as one indicator that the award was excessive. But it is not, by itself, dispositive.

With respect to the "magnitude" factor, the following observations seem pertinent. The sexual harassment to which Kotowski was subjected occurred on only two days, June 29 and June 30, 1989. It was thus of short duration.[22] Although it was serious, frightening, and resulted in great emotional distress, it was not of disastrous proportions. However, given the evidence that the harassment of Kotowski was only one in a series of sexual harassment incidents, the seriousness of the conduct for which Norcon is responsible is somewhat increased.

Concerning the importance of the policy violated, there is a strong public policy against sexual harassment in the work place.

With respect to the wealth of the defendant, Norcon apparently had a pre-tax net profit of more than $19,000,000 in fiscal year 1990. This was doubtless related to the oil spill cleanup as profits were much less in the following years. The $3,700,000 award in this case would not necessarily bankrupt Norcon, but it is more than is necessary to drive home the message to Norcon that it should not tolerate sexual harassment and that it should take affirmative steps to guard against such conduct.

Other possible factors are suggested by the Model Punitive Damages Act promulgated by the Uniform Law Commissioners. The model act lists nine relevant factors:

(1) the nature of defendant's wrongful conduct and its effect on the claimant and others;

(2) the amount of compensatory damages;

(3) any fines, penalties, damages, or restitution paid or to be paid by the defendant arising from the wrongful conduct;

(4) the defendant's present and future financial condition and the effect of an award on each condition;

(5) any profit or gain, obtained by the defendant through the wrongful conduct, in excess of that likely to be divested by this and any other actions against the defendant for compensatory damages or restitution;

(6) any adverse effect of the award on innocent persons;

(7) any remedial measures taken or not taken by the defendant since the wrongful conduct;

(8) compliance or noncompliance with any applicable standard promulgated by a governmental or other generally recognized agency or organization whose function is to establish standards; and

(9) any other aggravating or mitigating factors relevant to the amount of the award

Model Punitive Damages Act (U.L.A.) § 7(a).

Factors (1), (2) and (4) are similar to those we have previously identified as relevant. We discussed them above. Factor (5), any profit or gain through the wrongful conduct, is apparently not an element in this case as there is no evidence concerning it. Factor (3) requires consideration of fines, penalties, damages, or restitution. It does not appear that Norcon has been made to pay any fines, penalties, or restitution. Thus, except by this litigation, Norcon has not been punished. No evidence was presented concerning Factor (6) (adverse effect of award on innocent

---

22. But her emotional distress continued through the interrogation of July 2 and until she left Valdez two days later.

persons), Factor (7) (remedial measures taken or not taken), or Factor (8) (compliance or noncompliance with any applicable standard). Factor (9) requires consideration of any potentially relevant aggravating or mitigating factors. One aggravating factor here is that the jury could have found two serious wrongs in this case, sexual harassment and punishment of the person who reported wrongful conduct.

■ In light of the foregoing considerations, we find the award of punitive damages excessive, but that a substantial award is justified. We recognize that the process by which a maximum justifiable award is decided cannot be explained in comprehensive detail. Such decisions thus may seem in part arbitrary. It is, nonetheless, our ineluctable duty to reach a decision. Our decision is that the maximum justifiable punitive damage award on this record is $500,000. We thus order a remittitur to this amount. Should Kotowski choose not to accept this remittitur, she is entitled to a new trial on punitive damages issues.

### H. *Veco's Vicarious Liability for Sexual Harassment*

Kotowski argues that the superior court should have found Veco liable as a matter of law for any sexual harassment for which Norcon is liable. Kotowski bases this argument on the doctrine of non-delegable duty.

■ "A non-delegable duty is an established exception to the rule that an employer is not liable for the negligence of an independent contractor." *Jackson v. Power*, 743 P.2d 1376, 1383 (Alaska 1987). Non-delegable duties typically concern matters that might endanger the safety of others. *See id.* at 1385 ("general acute care hospital's duty to provide emergency room physicians non-delegable"); *Alaska Airlines, Inc. v. Sweat*, 568 P.2d 916, 925–26 (Alaska 1977) (duty of common air carrier for safety of passengers non-delegable). However, " '[i]t is difficult to suggest any criterion by which the non-delegable character of such duties may be determined, other than the conclusion of the courts that the responsibility is so important to the community that the employer should not be permitted to transfer it to

another.' " *Jackson*, 743 P.2d at 1384 (emphasis omitted) (quoting W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser and Keeton on the Law of Torts*, § 71 at 512 (5th ed.1984)). A non-delegable duty may be voluntarily assumed by contract. *See Jackson*, 743 P.2d at 1383.

In *Jackson* we held that a general acute care hospital providing emergency room services was liable, under the theory of non-delegable duty, for the negligence of an emergency room physician who was an independent contractor rather than an employee of the hospital. *See id.* at 1384–85. In *Sweat* we held that the doctrine of non-delegable duty prevented a scheduled common carrier airline from escaping liability for a crash attributable to an independent contractor's pilot error. 568 P.2d at 925–26.

■ The situation in the present case is notably different. While Veco enjoyed exclusive control over the cleanup operation, this exclusive control was the product of a private contract between Veco and Exxon, not of a public franchise or license granted by the government in the context of a highly-regulated industry. While the existence of a non-delegable duty is not necessarily dependent on the degree to which an industry is subject to regulation or licensing, we find the absence of a comprehensive scheme of public regulation, licensing, and franchising significant in answering the question of whether a non-delegable duty existed in the case before us. We conclude that the fact that the government did not grant Veco a monopoly-like franchise or license within the context of a highly-regulated industry tilts the balance towards the conclusion that Veco had not assumed a non-delegable duty to members of the public to prevent acts of sexual harassment by its independent contractors.

In *Jackson* we observed that the hospital regulatory scheme "manifests the legislature's recognition that it is the hospital as an institution which bears ultimate responsibility for complying with the mandates of the law." 743 P.2d at 1384. In *Sweat*, we observed that "[a] scheduled common carrier such as Alaska [Airlines] is given a monopoly or semi-monopoly primarily for the purpose

of furnishing safe and reliable scheduled air transportation." 568 P.2d at 926. These observations suggest the reason why the granting of public licenses or franchises in a highly-regulated industry may be a significant factor in determining whether a non-delegable duty exists. The public's grant of a monopoly-like franchise in such an industry is an act of trust which places a corresponding duty upon the holder of such a franchise to bear the ultimate responsibility to ensure that this exclusive franchise is exercised in a safe manner. After all, it is this concern for public safety which frequently underlies the highly-regulated nature of the industry at issue, as well as the granting of exclusive franchises and licenses within the industry.

We do not see a comparable assumption of responsibility towards the public by Veco, nor do we see a comparable placing of the public trust in Veco. The government did not grant Veco the exclusive right to conduct the oil spill cleanup; Exxon did. Veco did not receive a public franchise or license that would place the ultimate responsibility for public safety on its shoulders. Instead, Veco merely entered into a contract with another private party, and then hired an independent contractor to perform certain duties it had assumed under this contract. "In general, the employer of an independent contractor owes no duty to the independent contractor's employees to protect them from the negligence of the employees' own master." *Moloso v. State*, 644 P.2d 205, 210 (Alaska 1982). Because we conclude that Veco did not assume a non-delegable duty to protect the safety of its independent contractor's employees as members of the general public, we hold that the superior court did not err in ruling that Veco was not liable as a matter of law for the sexual harassment for which Norcon was liable.

## I. *Reduction of the Attorney's Fee Award*

█ The superior court awarded Kotowski $379,526.06 in attorney's fees, pursuant to

the schedule set forth in Alaska Civil Rule 82. While our decision has not altered the basic fact that Kotowski was the prevailing party, the size of Kotowski's attorney's fee award will need to be recalculated in light of the reduction in the damages award. Accordingly, we vacate the award of attorney's fees.

## V. *CONCLUSION*

The jury's verdict that Norcon is liable for sexual harassment and intentional infliction of emotional distress is AFFIRMED. The verdict that Norcon is liable for negligent infliction of emotional distress is AFFIRMED. Norcon is entitled to an offset against compensatory damages in the sum of $20,000 because of the Exxon settlement. The award of punitive damages is excessive. We order a remittitur to a punitive damage award of $500,000. If Kotowski does not accept this award, a new trial on the issue of punitive damages shall be held. The jury's verdict finding Veco not liable to Kotowski is AFFIRMED. Kotowski is entitled to a new trial on her claims for unpaid wages, overtime, and penalties. The award of attorney's fees in favor of Kotowski should be VACATED and recalculated when a final judgment is entered.[23]

EASTAUGH, Justice, concurring.

MOORE, Chief Justice, COMPTON, Justice, not participating.

EASTAUGH, Justice, concurring.

Although I agree with the result reached by the court on all issues, I am writing separately to explain my reasoning on the punitive damages award and the remittitur. The court's opinion discusses factors potentially bearing on the award of punitive damages. I agree with that discussion in the abstract, but the only factors germane here are those which these parties agreed would govern this jury's deliberations.

---

**23.** In her cross-appeal Kotowski argues that she should have been awarded interest on the jury's award from the time the verdict was announced rather than from when the judgment was entered. She also contends that the court erred in not awarding her full costs, in awarding attor-

ney's fees to Veco, and in apportioning costs and fees between Norcon and Veco. We have reviewed these points and find them meritless. Kotowski also raises a number of points relating to discovery and the preclusion of testimony which are mooted by our disposition herein.

The punitive damages instruction allowed the jury "to decide an amount that would fairly accomplish the purposes of punishment and deterrence." The instruction submitted only these factors to the jury: the magnitude and flagrancy of the offense, the importance of the policy violated, Norcon's wealth, and the amount of compensatory damages. We have long discussed these factors in analyzing punitive damages issues in Alaska,[24] but they offer a jury little guidance. Whether they offer too little is not before us here; Norcon did not object to the substance of the punitive damages instruction.[25] My comments concern several of these factors.

Norcon argues that the punitive damages-compensatory damages ratio is excessive. The instruction did not limit the jury to a maximum ratio.[26] And in my view, a fixed ratio may result in punitive damages awards which are either too large or too small, and thus not optimally effective in punishing and deterring outrageous conduct.[27] If compensatory damages are small relative to the expense of litigating, restricting a jury to a fixed ratio may prevent it from entering an award that is large enough to deter or punish outrageous conduct. For example, applying a fixed three-to-one ratio in this case would limit punitive damages to $31,033. Such an award would be unlikely to deter conduct like that of Norcon after Kotowski reported Posehn's harassment. It would be insufficient to encourage employers like Norcon to adopt and enforce effective anti-harassment policies and procedures, and would probably make it more economic to litigate such claims than to avoid and cure the problem revealed by Kotowski's report.

At the other end of the scale, if compensatory damages are very large, even a ratio as low as three-to-one could lead to a needlessly large, and thus not optimal, punitive damages award. And a compensatory award that is very large relative to the cost of adopting and enforcing effective anti-harassment policies and procedures may also justify a relatively smaller punitive award.

Likewise, the cost of prosecuting a case relative to the potential size of a compensatory award may bear on the size of an optimal punitive damages award and thus on the punitive damages-compensatory damages ratio. Norcon employed Kotowski only briefly. Consequently when she reported Posehn's harassment, Norcon could anticipate that any wage loss claim would be modest. Indeed, the expense and aggravation of litigation and the prospect of modest compensatory damages awards would deter some ex-employees in Kotowski's position from pursuing any claim. Therefore, the relatively high (forty-eight-to-one) ratio following remittitur here is still within permissible limits.

Nonetheless, I agree with the remittitur the court requires because $500,000 is, in my view, the largest punitive damages award that can be justified here. Posehn's conduct was outrageous and Norcon's corporate response to Kotowski's complaint was appalling. But the remittitur is appropriate because unexplained evidence of a defendant's wealth or annual earnings provides little insight into the size of award needed to alter or punish corporate culture. There is no evidence of how much Norcon saved annually by failing to adopt and enforce an effective anti-harassment policy and by failing to educate and supervise supervisors like Posehn and

**24.** *See, e.g., Sturm, Ruger & Co. v. Day*, 594 P.2d 38, 48 (Alaska 1979), *overruled on other grounds, Dura Corp. v. Harned*, 703 P.2d 396, 405 n. 5 (Alaska 1985).

**25.** The legislature has now enacted a statute listing factors to be considered in punitive damages cases. AS 09.17.020(c). That statute does not apply to Kotowski's cause of action, which accrued before the statute's effective date. Ch. 26, § 55, SLA 1997.

**26.** Moreover,
[t]his court has refused to prescribe a definite ratio between compensatory and punitive damages. Though comparing punitive and actual damages awards is one way to determine if punitive damages are excessive, other factors, such as the magnitude and flagrancy of the offense, the importance of the policy violated, and the defendant's wealth, are equally important to the determination.
*Cameron v. Beard*, 864 P.2d 538, 551 (Alaska 1993) (citations omitted).

**27.** *Cf. BMW of North America, Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (recognizing that higher ratios may be justified by circumstances).

those who tacitly approved his conduct. One can only guess at the maximum amount necessary to convince Norcon that it must change its corporate ways. In my view, an award no larger than $500,000 should be ample to remove all profit derived by tolerating such practices and to punish Norcon. Any larger award is therefore both unnecessary and inefficient.[28] Given the annual earnings discussed in note 20 of the court's opinion, any larger award would be unreasonable.

**28.** *See* A. Mitchell Polinsky and Steven Shavell, *Punitive Damages: An Economic Analysis,* 111 Harv. L.Rev. 869, 879–80 (1998).